**Opinion issued June 26, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00922-CR**

———————————

**JAROD LOUBSER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 19-DCR-088502A**

---

**MEMORANDUM OPINION**

A jury convicted Jarod Loubser of the second-degree felony offense of sexual

assault and assessed his punishment at five years' confinement.[1] In two issues on

---

[1]     *See* TEX. PENAL CODE § 22.011(a)(1)(A), (C), (b)(1).

appeal, Loubser contends that (1) the State failed to present sufficient evidence to support his conviction; and (2) the trial court erred by allowing evidence of three extraneous bad acts.

We affirm.

## Background

Loubser and the complainant E.S. ("Ester Sikes")[2] met in between class periods at Foster High School during the spring semester of 2017. Ester was fifteen years old and in her freshman year. Loubser was eighteen years old and in his junior year. Ester and Loubser had mutual friends, and she had heard of him, but they had not directly interacted. One day, Ester was running late to class, and Loubser saw her in the hallway. He made a funny comment to her, and they exchanged contact information and began getting to know each other.

Although Ester was attracted to Loubser from the beginning, their relationship did not immediately turn romantic or sexual. Instead, they finished the school year "as really just being friends." During summer 2017, Ester and Loubser started having a consensual sexual relationship that Ester described as "[m]ore exclusive, not really talking to anybody else." They would sometimes go on lunch or dinner dates, but

---

[2] "Ester Sikes" is the pseudonym that the complainant chose to use during the trial proceeding.

they typically spent time together smoking marijuana in Loubser's backyard before going up to his bedroom to have sex.

At some point during the summer, an ex-girlfriend of Loubser's reached out to Ester and explained "that they were still in contact with each other." Ester decided to distance herself from Loubser for a while. They continued to have "casual conversations," but they did not hang out like they had before and "there was no physically seeing each other."

When the next school year started, the romantic and sexual aspect of Ester and Loubser's relationship was still on pause. However, towards the end of the fall semester, Ester and Loubser discussed "him talking to other people," and they agreed to "just forgive and forget, and move on from then." Their sexual relationship resumed, but Ester did not consider it to be exclusive. They had sex "[m]aybe once or twice a week," and they would usually skip school to go to Loubser's house. Marijuana was "almost always" involved when they were together.

During this school year—Ester's sophomore year and Loubser's senior year— two incidents occurred that caused discord in their relationship. In the first incident, Loubser slapped Ester in the face while they were having sex. Ester reflexively slapped him back, and they had an argument "because [they] had never talked about anything in that nature before," meaning rough sex. Loubser never again slapped Ester during sex. They continued having "consensual sexual encounters" after this

3

incident, but "not as many as before." Ester "felt very disrespected, and [she] kind of felt like [they] were on different pages of what [they] wanted."

In the second incident, Ester learned from a mutual friend that Loubser had taken a video of them having sex and then showed that video to some of his friends. Ester confronted Loubser about this in between class periods. The ensuing argument involved yelling and Loubser throwing a trash can down the hallway. After teachers told them to get to class, Loubser took Ester to a stairwell to continue the argument. Ester told Loubser that she did not appreciate his actions, and she did not want that to happen again. At Ester's request, Loubser both showed her the video and deleted it from his phone.

After the incident with the video, Ester and Loubser "stopped having sex with each other, and it turned more into just a mutual friendship again." They would occasionally hang out with a group of friends, skipping class to smoke marijuana. Ester testified that they had a "good relationship," but it was not "as close and trustworthy as before." They would check in with each other by text message once or twice a week, which was a significant decrease from their communication before the video "where it was all the time every day." However, Ester did hand-make a Valentine's Day card for Loubser, and they ended up having sex on Valentine's Day 2018.

During the spring semester of 2018, Ester began dating a girl she had met during junior high school. Ester called this an "exclusive relationship." Ester did not spend one-on-one time with Loubser while she was dating her girlfriend. She and Loubser occasionally sent each other text messages, and Ester would sometimes share information about her relationship, but she did not characterize their conversations during this period as "deep."

When the summer holidays arrived, Ester was still dating her girlfriend. Ester and Loubser "hardly talked"; instead, their interactions were "more just kind of like a little catch-up and then not talk for a couple more weeks." In mid-June 2018, Ester and Loubser began "talking about how [they] hadn't hung out in a while, and hadn't smoked in a while, and [Loubser] had asked [Ester] if [she] wanted to come over and smoke" and catch up. During this conversation, Loubser "brought up how [they] can't keep [their] hands off of each other."[3] Ester told Loubser: "I'm not coming over to have sex with you. I want to hang out with you, I want to catch up with you, and just smoke." They agreed to meet later that afternoon.

Ester's parents dropped her off at Loubser's house on their way into Houston to celebrate their anniversary. After Ester arrived at Loubser's house, they spent

---

[3] When asked how she reacted to this statement by Loubser, Ester testified: "I got defensive, because I knew that not every single time that we hung out, we were being intimate with each other. So, I just simply stated that that wasn't what I was going over there for. And that I had a girlfriend, and that was none of my intentions at all."

around thirty to forty-five minutes in the backyard, smoking marijuana and discussing what had been happening in their lives. The tone of their conversation was "[v]ery light" and "uplifting." There was no touching beyond passing a joint back and forth, and they did not flirt with each other.

After they finished smoking, they went inside the house and got some water before heading to Loubser's bedroom. Ester laid on Loubser's bed—the "normal" place where she would sit when she was in his bedroom—and started looking at her phone while Loubser went into the attached bathroom. Ester was face-down on the bed with her feet dangling off the end of the bed.

Ester heard the door to the bathroom open, and Loubser walked over to the bed, where he stood with his legs on either side of Ester's. She testified:

> Just not fully on me yet, but he was standing there. And I could almost like hear him kind of mess around with like his pants. And after a few seconds, he got on top of me while I was still on my stomach, and I was asking him what he was doing. And he was—he was like, "It's okay, it's what we always do," and stuff like that. And I was trying to flip myself over to be facing towards him more, and that's when he started to get a lot more aggressively, physical with me. The more I started to kind of squirm under him. And the next thing you know, my shorts were being moved over from my crotch, and he forcefully put himself inside of me.

At the beginning of the assault, Loubser grabbed both of Ester's wrists and held them pinned behind her back. She was "completely restrained" and unable to turn over. Ester told Loubser to stop and questioned what he was doing, but the more she spoke or tried to move, the more aggressive he became. Loubser sometimes pushed Ester's

head "down into the covers," and she had to turn her head to the side to breathe. Eventually, Ester "just laid there" and stopped moving, figuring that "it would maybe go on fast" if she "just cooperated with what was happening."

Afterwards, Loubser went back into the bathroom and brought Ester a towel to clean herself up. She did so and then curled up into the fetal position on the bed, "completely like spaced out," and looked at her phone. Loubser took a picture of Ester, put a caption on it that said "I loved you," and sent it to her.

They sat in Loubser's bedroom in silence for several minutes before a mutual friend arrived at the house to smoke. Ester "followed to the backyard and got as high as [she] possibly could" in the hope that it would make her feel better. She did not leave because she did not have a ride home: her parents were out celebrating their anniversary, and she "was not about to be the reason that their dinner was ruined or not be able to eat."

Ester, Loubser, and their friend then went to a local barbecue restaurant. Ester spent most of the time on her phone rather than eating. The three of them then went to a nearby park. On the way to the park, Loubser took a picture of them. In the picture, Ester was holding a joint.[4] She testified that by this point she was "feeling high" and was "kind of starting to get into a more talkative state" instead of "being

---

[4]    Loubser introduced a short video and a screenshot taken at the same time as the picture. Ester is smiling in the screenshot.

7

in a very disassociated state." The three of them smoked again at the park. Loubser was behaving "[l]ike nothing was different." Ester was trying to behave in a way that their friend would not notice that anything was wrong because she "didn't want to believe what just happened by saying it out loud." They returned to Loubser's house around sunset, and Ester's parents were there waiting to pick her up. She hugged Loubser before getting in her parents' car so they would not suspect that anything had happened.

Ester did not inform her parents about what had happened, nor did she report the assault to law enforcement. Following the assault, Ester "fell into manic depression," started smoking marijuana even more heavily, and self-harmed. She eventually told her girlfriend about what had happened after she had a panic attack at school. Ester's girlfriend did not believe her; instead, she believed Ester was "just making up an excuse to have sex with [Loubser], which was not the case." They ended their relationship that same day.

In May 2019, nearly one year after the assault, Ester was arrested for shoplifting. She spoke with a counselor at the Fort Bend County Jail as part of a risk assessment during the booking process. The counselor asked whether Ester had ever been sexually assaulted, and Ester's demeanor changed. After being asked again, Ester reported that she had been sexually assaulted, and she provided Loubser's

name. Ester later spoke about the assault more in depth with a detective, and this detective testified as an outcry witness.

The jury found Loubser guilty of the offense of sexual assault and assessed his punishment at five years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his first issue, Loubser argues that the State failed to present sufficient evidence to support his conviction. Specifically, he argues that he and Ester had a consensual sexual relationship, and the State did not present sufficient evidence that Ester did not consent to the sexual contact that occurred in June 2018.

### A. Standard of Review

When addressing a sufficiency of the evidence complaint, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The factfinder has "full responsibility" to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* We consider the "cumulative force of all evidence" in determining whether the evidence was sufficient to establish each element of the offense. *Id.*

The factfinder is the sole judge of the credibility of the witnesses, and it may choose to believe all, some, or none of the testimony presented. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). We may not sit as a "thirteenth juror" and substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Id.* The factfinder "may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Id.* (quoting *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014)). When the record supports conflicting inferences, we presume that the factfinder resolved the conflict in favor of the prosecution and defer to that factual determination. *Id.*

## B.     Analysis

To obtain a conviction in this case, the State was required to prove that Loubser intentionally or knowingly sexually assaulted Ester by either (1) causing his sexual organ to penetrate Ester's sexual organ without Ester's consent or (2) causing his sexual organ to contact Ester's sexual organ without her consent. TEX. PENAL CODE § 22.011(a)(1)(A), (C). "'Consent' means assent in fact, whether express or apparent." *Id.* § 1.07(a)(11). With respect to the consent element of this offense, the State was required to prove that Loubser compelled Ester to submit or participate by use of physical force, violence, or coercion. *Id.* § 22.011(b)(1); *see Delarosa v. State*, 677 S.W.3d 668, 675 (Tex. Crim. App. 2023) ("But when a defendant is charged

under § 22.011(a)(1), lack of consent is an essential element that the State must prove.").

In establishing lack of consent, the statute places the emphasis on "the actor's compulsion rather than the victim's resistance." *Carbajal v. State*, 659 S.W.3d 164, 180 (Tex. App.—El Paso 2022, pet. ref'd); *Gonzales v. State*, 2 S.W.3d 411, 415 (Tex. App.—San Antonio 1999, no pet.) ("The degree of physical resistance by a victim does not render the evidence insufficient to prove the lack of consent."). "The State is not required to demonstrate any certain threshold of force used to compel the victim's submission, only that the defendant used some force." *Carbajal*, 659 S.W.3d at 180. Bodily injury to the complainant is not an element of the offense. *Id.*; *Mathis v. State*, 443 S.W.3d 391, 396 (Tex. App.—Austin 2014, no pet.) (op. on reh'g). The facts of each individual case determine whether the defendant used force. *Gonzales*, 2 S.W.3d at 415.

A sexual assault conviction is supportable on the uncorroborated testimony of the victim of the offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date of the alleged offense. TEX. CODE CRIM. PROC. art. 38.07(a). The requirement that the victim inform another person of the alleged offense does not apply if at the time of the alleged offense, as in this case, the victim was seventeen years of age or younger. *Id.* art. 38.07(b)(1).

11

Loubser argues that the State failed to present sufficient evidence that Ester did not consent to the sexual activity that occurred at Loubser's house in June 2018. He argues that "[i]t was clearly understood that sex was always typical between" them. He points out that after Ester was allegedly sexually assaulted, she remained in Loubser's company for several more hours, going to a nearby restaurant and then a park before her parents picked her up. Furthermore, Ester did not mention the assault to anyone until she was arrested almost one year later.

Ester testified that she had a sporadic sexual relationship with Loubser from summer 2017 through Valentine's Day 2018. Their relationship typically involved them skipping class, smoking marijuana at Loubser's house, and then going to his bedroom to have sex. After Valentine's Day 2018, they did not spend much time together. Instead, while they occasionally shared brief life updates via text message, Ester spent much of her time with a new girlfriend.

On the day of the assault in June 2018, Ester and Loubser started texting. They discussed the fact that they had not talked much lately, and Loubser invited Ester over to his house to smoke marijuana and catch up. During this conversation, he commented that they "can't keep [their] hands off of each other." Ester informed him that she intended to come over to smoke and talk, not to have sex.

After smoking marijuana in Loubser's backyard, they went to Loubser's bedroom. Ester settled on Loubser's bed, which was normal for her if they were

alone in his bedroom, and Loubser went to the attached bathroom. Ester laid face-down, with her legs partially hanging off the bed. While she was on her phone, she heard Loubser leave the bathroom. Loubser stood at the end of the bed with his legs on either side of Ester's. She continued looking at her phone, but she could hear Loubser "mess around" with his belt buckle or the zipper of his pants.

While Ester was still face-down on the bed, Loubser climbed on top of her. Ester asked him what he was doing, and he responded, "'It's okay, it's what we always do,' and stuff like that." Ester tried to turn over so she could face Loubser, but he "started to get a lot more aggressively, physical with" her. He pinned both of her wrists behind her back, "completely restrain[ing]" her and preventing her from turning over. Ester testified that she told Loubser to stop, but the more she spoke or physically struggled, the more aggressive Loubser became. Ester was unable to breathe at some points because Loubser pushed her head down into the covers, and she had to turn her head to the side to catch her breath. Eventually, Ester stopped struggling, hoping that if she cooperated, "it would maybe go on fast." Loubser pushed Ester's shorts aside and engaged in vaginal intercourse.

Based on Ester's testimony alone,[5] a rational jury could have concluded beyond a reasonable doubt that Ester did not consent to sex in June 2018 because

---

[5] Detective Kara Roberts testified as the outcry witness. Ester's statements during their interview were consistent with her later trial testimony. For example, Roberts testified that Ester "stated while she was laying there [on the bed], and didn't know

13

Loubser compelled her "to submit or participate by the use of physical force, violence, or coercion." *See* TEX. PENAL CODE § 22.011(b)(1); *Carbajal*, 659 S.W.3d at 180.

In arguing that the State failed to prove lack of consent, Loubser also points to Ester's testimony that, following the assault, she stayed on Loubser's bed and then, when their friend arrived, she joined them in smoking marijuana and going to a nearby restaurant and park. He further points out that when Ester's parents picked her up from Loubser's house, she did not mention the assault. In fact, she did not mention the assault until nearly one year later, after she was arrested.

Ester described her mental state after the assault as "completely like spaced out." When their friend arrived at Loubser's house, she joined them in the backyard "and got as high as [she] possibly could" to try to feel better. The friend's presence made Ester feel "a bit comfortable," but she did not feel like herself. She testified that she tried to act like everything was fine while interacting with their friend because she did not want him to know that something had happened, and she also did not want to believe what had happened.

---

[Loubser] had returned, she felt Mr. Loubser grab the shorts she was wearing, and pull them and move them to the side" before engaging in intercourse. Roberts also testified that Ester "immediately was saying, 'No, no, this can't happen'"; she "[t]ried to fight him off using her arms and her legs"; and "after fighting as long as she could, she eventually just stopped moving and laid there until he was completed doing what he was doing."

14

Ester had not driven herself to Loubser's house, and she was reluctant to call her parents to pick her up because they were in Houston celebrating their anniversary, and she did not want to ruin their evening. When her parents picked her up, she hugged Loubser like she normally did so they would not question her.[6] Although Ester eventually told her girlfriend what had happened—which led to an accusation that Ester had simply wanted an excuse to have sex with Loubser and to the end of her relationship with her girlfriend—she did not tell an adult about the assault until nearly one year later, when she underwent a risk assessment with a counselor after being arrested.

The jury also heard testimony from Lori Long, a forensic nurse in the Memorial Hermann healthcare system, who testified about topics including sexual assault examinations, the neurobiology of trauma and how trauma can manifest in people, interpersonal violence, sexual abuse disclosures, and delayed outcries.[7] Long explained some rationales behind delayed outcries:

> If we are going to talk, specifically, about like the teenage adolescent population, a lot of it is tied to what their consequences will be. They are driven 100 percent by their peer acceptance, by things that, as adults, we find kind of probably not as significant as they do. You know, how this will impact them in their friend group. What would

---

[6]     Ester testified that her family is "very loving" and "very supportive." Nevertheless, she also stated: "[T]hey would never wish any bad on me. And like I know that, and I still do to this day, but I didn't even want to try and relive or think or have my parents know what I had been through."

[7]     Long had never met Ester.

happen—you know, being ostracized if they would be made fun of. If they would be talked about. So, those things kind of drive them to keep things more close to the vest. They won't necessarily share with family or people of authority, because of the consequences of being grounded or [told], "You can't be around that person." It changes their actions. So, they feel like they have nowhere to turn.

So, ultimately, what ends up happening is an outcry is made to someone else. They feel comfortable at school, and they tell a counselor, who's then obligated to get the ball rolling to something else. They tell someone with their church. They tell a friend, and that friend gets freaked, and they tell their mother. And, so, it is usually by this snowballing event that started elsewhere, because they just don't feel comfortable sharing. And there is a lot [of] guilt and shame associated with their actions.

Long testified that delayed outcries are "[v]ery common" with teenagers and adolescents. Long also testified that sexual assault victims are less likely to report the assault when they know their assailant, in part because victims frequently want to avoid causing problems for someone that they know.

As the factfinder, the jury could have believed Ester's testimony about the assault, as well as her explanations for why she did not immediately leave Loubser's house but instead spent the next several hours in his presence, why she did not want their friend to realize what had happened, and why she did not inform her parents of the assault. *See Garcia*, 667 S.W.3d at 762 (stating that jury is "the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented"). We may not act as the "thirteenth juror" and substitute our judgment for this credibility determination. *See id.*

16

Considering the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have determined beyond a reasonable doubt that Loubser acted without Ester's consent and sexually assaulted her. *See* TEX. PENAL CODE § 22.011(a)(1)(A), (C), (b)(1). We hold that sufficient evidence supports Loubser's conviction.

We overrule Loubser's first issue.

### Admission of Extraneous Bad Acts

In his second issue, Loubser contends that the trial court erred by admitting evidence of the following extraneous bad acts: (1) Loubser once slapped Ester during sex; (2) on another occasion, he secretly recorded them having sex and later shared that recording with his friends; and (3) upon being confronted by Ester about the recording, he became angry and threw a trash can.

### A. Standard of Review and Governing Law

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We will uphold a trial court's ruling on admissibility so long as it is within the zone of reasonable disagreement. *Inthalangsy*, 634 S.W.3d at 754.

17

Ordinarily, evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with that character. TEX. R. EVID. 404(b)(1); *State v. Nunez*, 704 S.W.3d 598, 624 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) ("An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused.") (quotations omitted). However, extraneous offense evidence may be admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). The purposes listed in Rule 404(b) "are neither mutually exclusive nor collectively exhaustive" because the rule is one "of inclusion rather than exclusion." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (quotations omitted); *see Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) (stating that Rule 404(b) "excludes only evidence that is offered solely for proving bad character and conduct in conformity with that bad character").

Extraneous offense evidence may also be admissible to rebut defensive theories such as fabrication, even if such defensive theories are raised during opening statements. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *Powell v. State*, 63 S.W.3d 435, 438–39 (Tex. Crim. App. 2001). Defense counsel's opening statement "is not itself evidence," but it does "inform the jury of 'the nature

18

of the defenses relied upon and the facts expected to be proved in their support.'"

*Bass*, 270 S.W.3d at 563 n.7 (quoting TEX. CODE CRIM. PROC. art. 36.01(a)(5)). When the defense makes its opening statement immediately after the State's opening, "the State may reasonably rely on this defensive opening statement as to what evidence the defense intends to present and rebut this anticipated defensive evidence during its case-in-chief as opposed to waiting until rebuttal." *Id.*

Code of Criminal Procedure article 38.371 applies to a proceeding in the prosecution of a defendant for an offense against a person in a dating relationship with the defendant. TEX. CODE CRIM. PROC. art. 38.371(a); TEX. FAM. CODE § 71.0021(b) (defining "dating relationship" as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature"). Article 38.371 provides:

> (b)    In the prosecution of an offense described by Subsection (a), subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.
>
> (c)    This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. art. 38.371(b)–(c).

19

Although article 38.371 states that it is "subject to the Texas Rules of Evidence or other applicable law" and it "does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law," courts have interpreted this article as "expressly provid[ing] for the admission of extraneous offense evidence regarding the nature of the relationship between an accused and a complainant." *McDonnell v. State*, 674 S.W.3d 694, 701–02 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (quotations omitted); *Valdesgalvan v. State*, 664 S.W.3d 407, 412 (Tex. App.—Fort Worth 2023, no pet.) ("[I]n cases in which the complainant is in a dating relationship with the accused, Article 38.371 expressly allows for the admission of extraneous offense evidence to show the nature of their relationship."). Article 38.371 therefore "provides another non-character-conformity purpose for admitting extraneous-offense evidence." *James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.); *see Rodriguez v. State*, 678 S.W.3d 375, 386 (Tex. App.—Dallas 2023, pet. ref'd).

"Areas of relevant and admissible extraneous-offense evidence that complies with article 38.371 include evidence that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between victim and assailant." *Fernandez v. State*, 597 S.W.3d 546,

20

566 (Tex. App.—El Paso 2020, pet. ref'd); *Valdesgalvan*, 664 S.W.3d at 413 ("[S]uch evidence can provide context that assists the trier of fact in understanding the actions of both the accused and the complainant."). Courts may permissibly conclude that evidence is admissible under both Rule 404(b) and article 38.371 to rebut a defendant's defensive theory that the complainant fabricated the assault or that no assault occurred. *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.— Houston [14th Dist.] 2017, no pet.) (disagreeing with defendant's contentions that Rule 404(b) and article 38.371 conflict and that prosecution's reliance on article 38.371 to admit extraneous-offense evidence constitutes "an end-run around Rule 404(b)").

Even if the evidence is admissible under Rule 404(b) and article 38.371, the trial court may exclude the evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403; *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022). Rule 403 favors the admission of relevant evidence, and it "carries a presumption that relevant evidence will be more probative than prejudicial." *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (quotations omitted); *James*, 623 S.W.3d at 549 ("Rule 403 is concerned not with prejudicial evidence but with evidence that is unfairly prejudicial."). A Rule 403 analysis generally balances four non-exclusive factors:

(1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.[8] *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019).

## B.     Analysis

In his opening statement, defense counsel began by asking: "Is it rape? Is it regret? Or is it, 'I need to get out of trouble, do whatever I can, get out of trouble.'" Counsel asserted that after being arrested for shoplifting, Ester searched "for any way out" and then "got sympathy" from the jail counselor when she stated she had been sexually assaulted. Counsel also stated that while Ester was in a "committed relationship [with her girlfriend] . . . she was having sex with Mr. Loubser that whole summer. So, that committed relation[ship] didn't mean much. And then, 'Oh,

---

[8]     The Court of Criminal Appeals has also described the Rule 403 balancing test as involving six considerations:

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

you know, I had sex with him and now my girlfriend is mad at me. It must have been rape.'" Thus, counsel's defensive theory was that Ester and Loubser had a consensual sexual relationship, and Ester fabricated the sexual assault for multiple possible reasons: regret; to avoid relationship problems with her girlfriend; or to garner sympathy and not be punished for shoplifting.

Before Ester testified about the underlying assault, the State asked: "[A]t some point during the times that you were having consensual sex with the Defendant, was there anything ever that happened that was violent?" Over defense counsel's objection, Ester testified that she "got slapped in the face during intercourse once." She slapped Loubser in response and they then had an argument because they had never discussed having rough sex before. Loubser never again slapped Ester during sex. She testified that she continued having sex with Loubser after this incident, but "[i]t was kind of more rare" because she "felt very disrespected, and [she] kind of felt like we were on different pages of what we wanted."

The State then asked Ester whether there was "anything else that stands out to you during this time that you were having consensual sex with the Defendant?" Ester responded that Loubser "secretly exploited [her] body, and [he] had shown mutual friends pictures and videos of [her]." Defense counsel objected and argued that "improper photography" was a felony offense and because Ester was a minor at the time, "we are now opening the door to the jury to considering he committed child

23

pornography," which would be highly prejudicial. The trial court allowed the testimony.

Ester testified that she learned about the video from a mutual friend. She confronted Loubser about the video in between class periods. The confrontation included "a lot of yelling," and at one point, Loubser picked up a nearby trash can and threw it.[9] Teachers told both Ester and Loubser to go to class, but they instead went to a stairwell where they finished their conversation. Ester asked Loubser to show her the video so she could determine if it was, in fact, her in the video. The video depicted Ester and Loubser in bed and having sex. Ester informed Loubser that she did not appreciate the video, and she did not want that to happen again. At Ester's request, Loubser deleted the video from his phone. Following this incident, Ester and Loubser's relationship "turned more into just a mutual friendship again," although they did have sex on at least one more occasion—Valentine's Day 2018— before the underlying assault.

### 1.    Rule 404(b) and article 38.371

The extraneous acts evidence admitted in this case concerns "the nature of the relationship between [Loubser] and [Ester]" and constitutes "relevant facts and circumstances that would assist the trier of fact in determining whether [Loubser] committed the offense" of sexual assault. *See* TEX. CODE CRIM. PROC. art. 38.371(b).

---

[9]    On cross-examination, Ester agreed that Loubser did not throw the trash can at her.

Article 38.371 "provides another non-character-conformity purpose for admitting extraneous-offense evidence." *Rodriguez*, 678 S.W.3d at 386 (quotations omitted); *James*, 623 S.W.3d at 545; *see also McDonnell*, 674 S.W.3d at 703 ("The evidence of McDonnell's prior assaults and threats falls within the type of evidence courts have recognized as falling under both article 38.371 and Rule 404(b).").

Even if article 38.371 itself does not provide a non-character-conformity purpose for evidence that falls within its scope, use of extraneous acts to rebut a defensive theory is a permissible purpose under Rule 404(b). *See Bass*, 270 S.W.3d at 563. Loubser's defensive theory of the case was two-fold: (1) Ester consented to sex with Loubser on the June 2018 occasion, as she had throughout their on-again-off-again relationship; and (2) Ester later fabricated the allegations of sexual assault either to get out of trouble with her girlfriend, who was not pleased that Ester and Loubser were still having sex, or to alleviate her legal troubles after being arrested in May 2019. As the State argues, Loubser's opening statement made Ester's consent on the day of the assault a disputed issue, opening the door for the State to rebut Loubser's defensive theories with evidence that Loubser had, on two prior occasions, tested Ester's boundaries by introducing physical force into their sexual relationship and by recording their sexual activities, two actions that they had not previously discussed and that Ester did not appreciate.

We conclude that the trial court did not abuse its discretion by permitting the extraneous acts evidence under Rule 404(b) and article 38.371. *See McDonnell*, 674 S.W.3d at 703; *see also Gonzalez*, 541 S.W.3d at 312–13 (concluding that "it is at least within the zone of reasonable disagreement" that evidence of prior assault was admissible to explain complainant's recantation of allegations forming basis of charged offense and to rebut defensive theory of fabrication).

## 2. Rule 403

Loubser argues that the danger of unfair prejudice from admitting the extraneous acts substantially outweighed the probative value of this evidence. We disagree.

It is undisputed that Ester and Loubser had been involved in a consensual sexual relationship. Whether Ester consented to sex on the date of the alleged assault was the primary question in dispute at trial. Ester's credibility was therefore paramount. *See McDonnell*, 674 S.W.3d at 703 (stating that probative force of defendant's other bad acts—including prior assaults and threats against complainant—were "particularly relevant" when "the credibility of the witnesses was a central issue in the case"). The State needed the evidence to rebut Loubser's defensive theories that Ester consented to sex and that she fabricated the allegations of sexual assault to get out of trouble. *See James*, 623 S.W.3d at 548 ("[E]vidence of prior assaults and abuse makes it less likely that a complainant has fabricated the

charged offenses."). Additionally, the State needed the extraneous acts evidence because no one—other than Ester—witnessed the charged offense of sexual assault, no physical or DNA evidence was collected, Ester did not undergo a medical examination after the assault, she had no visible injuries, and, as mentioned, her credibility was at issue. *See id.*

The extraneous acts evidence also related to two instances that occurred several months before the date of the assault[10] and therefore the acts were not so remote in time that the probative value of this evidence was lessened. *See Brickley v. State*, 623 S.W.3d 68, 81 (Tex. App.—Austin 2021, pet. ref'd) (stating that prior incident occurring between seven months and two years before charged incident was not so remote that lapse in time "deplete[d] the probative value of the evidence"); *James*, 623 S.W.3d at 547 (concluding that extraneous offenses had probative value "as to [the defendant's] intent to commit the charged offenses" when extraneous acts and charged offenses all occurred within four-month period).

With respect to the potential for the extraneous acts evidence to impress the jury in some irrational way, we note that the trial court did not give a limiting instruction at the time Ester testified about the acts or in the jury charge. *See Rodriguez*, 678 S.W.3d at 387 ("[A]ny tendency to draw impermissible inferences

---

[10]     On cross-examination, Ester testified that the slapping incident occurred between Christmas 2017 and Valentine's Day 2018. The video incident also occurred before Valentine's Day 2018. The underlying sexual assault occurred in June 2018.

of character conformity can be minimized through a limiting instruction, and the trial court gave such an instruction.") (quotations omitted). However, although the extraneous acts—particularly the video recording and Loubser's actions during the ensuing confrontation over this video—did not involve acts that were similar to the charged offense of sexual assault, these acts were not more serious than the charged offense. *See id.*; *Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (concluding that potential for unfair prejudice was diminished when extraneous allegations "were no more serious than complainant's"); *see also James*, 623 S.W.3d at 549 ("[W]e hold that this third factor [the tendency of the evidence to suggest a decision on an improper basis] weighs in favor of admission of the extraneous-offense evidence that is not more heinous than the charged offenses.").

Furthermore, the extraneous testimony did not involve scientific evidence or a complex subject that risked confusing the jury; instead, it involved lay witness testimony concerning factual matters. *See Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006) (noting that scientific evidence "might mislead a jury that is not properly equipped to judge the probative force of the evidence"); *James*, 623 S.W.3d at 550 ("Our review of the record shows that the extraneous-offense testimony was from lay witnesses, not experts, and it described the various abusive incidents in a factual manner. None of the extraneous-offense evidence was scientific or complex.").

Presenting evidence of the extraneous acts did not take up a large amount of time. *See McDonnell*, 674 S.W.3d at 704. This evidence constituted approximately 12 pages of testimony during Ester's direct examination and 11 pages of testimony during Ester's cross-examination.[11] The guilt-innocence phase of trial lasted for three days and consisted of over 400 pages of testimony. *See Rodriguez*, 678 S.W.3d at 387 ("The extraneous acts were developed over the course of twelve record pages, not all of which were devoted to the acts. This represented a small fraction of the roughly 400-page record for the State's case-in-chief."). The focus of the trial was on Ester's testimony about the date of the assault and her actions afterwards, not on the extraneous acts.

The Court of Criminal Appeals has acknowledged that because sexual assault cases tend to be "he said, she said" trials without physical or other corroborating evidence, "the Rules of Evidence, especially Rule 403, should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant." *Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009). When balancing the relevant Rule 403 factors, we conclude that the trial court's decision that the prejudicial effect of the extraneous acts evidence did not substantially outweigh the probative value of this evidence did not

---

[11]  Loubser called as a defense witness the friend who—according to Ester—allegedly told her about the video. This friend denied ever seeing such a video. This witness's testimony lasted for approximately 4 pages.

fall outside the zone of reasonable disagreement. We therefore hold that the trial court did not abuse its discretion in admitting this evidence.

We overrule Loubser's second issue.

## Conclusion

We affirm the judgment of the trial court.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).